## 36375. HURT *v.* UNITED STATES FIDELITY & GUARANTY CO. *et al.*

DECIDED MARCH 6, 1957.

*Bobby Lee Cook,* for plaintiff in error.

*Hardin & McCamy, Carlton McCamy,* contra.

FELTON, C. J. The claimant testified that on or about January 16, 1955, he was employed as a carpenter with Johnson &

Johnson Construction Company; that he was engaged in putting corner boards on a silo building; that he was working on the outside of the building approximately 150 feet above the ground; that it was cold that day; that on the previous night it had rained and all during the day while he was performing his duties as a carpenter on the silo building approximately 150 feet above the ground, water continually dropped on his gloves and hands keeping his gloves and his hands wet; that he began his work on that day at 8 a.m. and worked for about four hours until dinner time; that water dropped on his hands all morning; that his hands became so cold and numb he could not even untie a rope around himself; that during the morning at about ten o'clock he descended to the ground, warmed his hands and dried his gloves and ascended to the top of the silo building to resume his work; that he worked for four hours after lunch; that the water dripped on his hands while he was working until dinner time; that he got colder during the day; that he could not say when the coldest time of the day was.

The defendants introduced evidence to show that on the day in question the temperature range in the general area was from a low of 29° to a high of 51°.

Two doctors testified on behalf of the claimant. One doctor is a general practitioner and admitted that he could not give an opinion as to frostbite or Renaud's phenomena because he was not familiar with or had any experience with such cases. The other doctor, Dr. Robert A. Waters, is a specialist and his entire testimony was as follows: (Direct examination) "Q. You are Dr. Robert A. Waters? A. Yes. Q. You are a practicing physician in Chattanooga? A. Yes. Q. Do you have a specialty? A. Diseases of the nervous system. Q. Commonly referred to as a neurologist or neurosurgeon? A. Yes. Q. How long have you been such? A. Two years, in private practice. Q. Where did you go to medical school? A. Emory University. Q. Are you a graduate—[Qualifications admitted.] Q. I will ask you whether or not you had occasion to see Oscar Newton Hurt from Menlo, Ga., in your professional capacity in 1955? A. Yes. Q. Was that patient referred to you by another physician? A. Yes, Dr. Allen. Q. When was the first visit of him

of your office? A. I saw him on one occasion on August 18th., 1955. Q. Did you obtain his past history and complaint? A. Yes. Q. Did you have him examined at that time? A. Yes. Q. What type of examination did you make of him? A. The nervous system. He complained he could not use his hands. Q. Did you examine his hands? A. Yes. Q. What did your examination of his hands disclose? A. An examination of his arms showed he had a diminished sensation on touching cold to the entire hand. Normal pulsation at wrist, a definitely diminished temperature in fingers. An examination of finger tips showed a small scarring, about pinhead size on the surface of the finger tips. Not present on all tips, but about three. There was a slight amount of swelling of all fingers. You could press on it, and could not see the indentation of your fingers. His primary handicap seemed to be motion of the fingers. I noted he could not place finger tips on his palm to make a fist. He could not bring the fingers and palm together. Q. Did that involve the fingers of both hands? A. Yes, all fingers, a swelling in all fingers. Q. What was your diagnosis of your patient at that time? A. From the history given and the examination I thought he had some damage to the soft tissues of the hand, particularly the fingers and blood vessels, a diminution in the blood supply, a lack of fluid through the blood vessels. Q. In your opinion, based on this history given you, what caused this condition? A. It could be caused by exposure to cold. That was the history he gave me. Q. Was it your opinion his condition was caused from exposure to cold based on this history and your examination? A. Yes, the history he gave me and the examination. I could find no other evidence of that condition. Q. Assuming a person was working in the open in January, where the temperature was 29 to 35 degrees; he was suspended in air 150 feet, and cold water was dropping on his hands, and that kept up for hours. Could that have caused his condition? A. Of course, I didn't see him prior to the exposure. Yes, at least it could have aggravated his condition. Q. Is he able to do manual labor now? A. As far as I could tell he would be handicapped in any work of a manual type. Q. That is due to the damage of the soft tissue damage? A. Yes. Q. Is there any way to improve his condition? A. He

was sent to me for consideration of that. Take out nerves on each side of the spinal cord which had swollen blood vessels. It was my impression it would benefit him, I thought it would repair the pain. I don't think it would repair the swelling. Q. In a condition such as this, if he was exposed to a cold temperature what would happen now to his hands? A. I think he would have pain probably greater than a normal person. Q. How would the condition of his hands be affected by use of his hands in doing carpentry? A. I think he would have pain that would limit the fingers. In carpenter work he would have difficulty in maintaining a grip on a hammer for any prolonged length of time. Q. His agility would be bad? A. Yes. (Cross-examination) Q. Did you find on your examination of Mr. Hurt any permanent change in the tips of his fingers, in August? A. He had small areas no larger than a pinhead on three fingers which he said was a result of exposure. Q. Have you had experience in treating frostbite? A. My experience is limited. In this climate we don't run into many cases of frostbite. Q. Are you qualified by experience to give any idea of the severity of temperature that would be required to cause frostbite in any definite period of time? A. That is not up to me. It is up to the court. All I can say is he has vascular changes which could be the result, but I don't say it resulted from extreme temperature. Q. Did you find anything in your examination to base the opinion that he was suffering from Renaud's phenomena? A. He possibly has. I don't know the condition of his hands before he allegedly sustained his frostbite. Q. If there is some one that examined him before this injury, and he has the same fingers as today, all frostbite would do is aggravate his condition? A. Possibly. Q. Assuming he worked outdoors without gloves at a temperature of 24 degrees, it varied from a low of 29 to high of 51, do you think in those temperature extremities he would suffer from frostbite? A. I doubt if he would if he had not had any water dropping on his extremities. If he had been dry I doubt if he would have. Q. Assuming water was dripping, isn't that conclusive the temperature was above freezing? A. Frost is not freezing. To get frostbite you don't have to freeze your hands. A man's hands don't have to be frozen to sustain damage. You can injure hands

by not exposing them to frost temperature, but exposure will damage them. Q. Over what period of time? A. I wouldn't want mine to stay there 6 hours. You can hold your hand on a piece of ice and not frost it. Q. Assuming he went to work at 8 o'clock in the morning using his hands in the performance of carpenter work, he would have circulation in his hand by using a saw? A. Yes. Q. That would enable him to withstand a lower temperature? A. He didn't give that case. Q. I am asking a hypothetical question. A. If he had kept using his fingers, moving them about all day long, which theoretically is impossible, he could maintain circulation, but no man can do that that long. Q. If a man is performing the duties of a carpenter, nailing on siding, and things like that and using his hands, and he testified he did that work for two hours, then came to a fire and warmed his hands, and worked two more hours, worked four hours, took time off for lunch, and worked four hours more in the afternoon, do you think under those circumstances the use of his hands would result in frostbite or freeze? A. No, but you have an entirely different history. Q. I understand that. A. According to what you just said I don't think he injured his hands at all. He couldn't injure them according to what you said. (Redirect examination) Q. If water had been dripping on his hands for a pretty long time that Mr. McCamey speaks of, that could make an entirely different result? A. There is a difference in dry and moist cold. If he had water on his fingers, and if stationary or holding something, or supporting his weight, and not in motion, it is an entirely different situation. Q. From the history and your examination this injury was caused from frostbite? A. From the history he gave me I think the injury to his hands could have been caused by frostbite and exposure. With his hands stationary supporting weight could have produced the injury. He gave no other injury to his hands."

We think the following finding of the full board was authorized: "One of the major factors in the decision by the full board in this case was the testimony by Dr. Waters whose testimony was based upon the testimony of the claimant, keeping in mind that Dr. Waters is a specialist to whom this claimant was referred. He testified positively that the claimant, performing the

work of a carpenter, nailing on siding and doing things of that type, using his hands for about two hours after which he descended to a fire and warmed his hands, returning to work for about two hours more up until lunch time and then returning to work for several more hours in the afternoon, that the use of his hands under those circumstances could not have resulted in frontbite or freeze. Dr. Waters testified that under those facts he could not have injured his hands at all and he would not have suffered any such injury as he contended that he had suffered."

As to whether the claimant suffered Renaud's phenomena as a result of his exposure or whether such exposure aggravated an existing disease of Renaud's phenomena, the medical testimony is inconclusive.

Since the evidence did not demand a finding in favor of the claimant, the court did not err in affirming the full board's award which in turn affirmed the deputy director's award denying compensation.

*Judgment affirmed. Quillian and Nichols, JJ., concur.*